IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA SHEEHAN,<br><br>      Plaintiff,<br><br>  v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, ET AL.,<br><br>      Defendants.<br>_____/ | No. C 09-03889 CRB<br><br>**ORDER GRANTING SUMMARY JUDGMENT** |

Plaintiff Teresa Sheehan has brought various section 1983 and state law claims against the City of San Francisco and two of its police officers. The officers shot Plaintiff multiple times as she wielded a large knife and threatened to kill them. Prior to the shooting, the officers had been attempting to help a social worker transport Plaintiff to a psychiatric detention facility for evaluation and treatment. Plaintiff's main claim is that the officers applied excessive force. Defendants have moved for summary judgment as to all claims. As explained below, the Court GRANTS Defendants' motion.

**I.      BACKGROUND**

On August 5, 2008, Heath Hodge, a social worker, went to Conrad House, a cooperative housing program for adults in need of mental health support in San Francisco, to check the status of Plaintiff's neighbor. Nisembaum Decl., Ex. A (dkt. 45) at 10, 33-34.

1  While there, Hodge knocked on Plaintiff's door and said through the door that he was
2  concerned about Plaintiff's health, and that he would return in a few days if she did not open
3  the door. Id. at 33-34. Plaintiff did not respond. Id. at 39-40.

4  On August 7, 2008, Hodge returned to Conrad House to check Plaintiff's health. Id.
5  at 55. Once there, Hodge knocked on Plaintiff's door, announced himself, explained that he
6  wanted check in on her and that he would enter the room if she did not respond. Id. at 57-58.
7  After hearing no response, Hodge, with the assistance of the property manager, opened
8  Plaintiff's apartment door. Id. at 59.

9  Once inside, Hodge observed Plaintiff lying on her bed with a book resting on her
10  face and then attempted to engage Plaintiff by asking her if she was okay. Id. at 59-60.
11  After initially not responding, Plaintiff leaped out of her bed and yelled for Hodge to leave
12  her room, threatening to kill him with a knife if he did not.[1] Id. at 61. Hodge left the room,
13  told the other residents to leave the building, and then went to his car to retrieve a 5150 form.
14  Id. 63.[2]

15  Hodge called the police to help him place Plaintiff under a 72-hour detention under
16  section 5150. Id. at 64. Shortly after the call, Officer Holder arrived at the Conrad House to
17  assist Hodge. Id. at 66. Because Officer Holder had never before helped a social worker to
18  effectuate a 5150 arrest, she called her street sergeant, Kimberly Reynolds, for help. Loebs
19  Decl., Ex. B (dkt. 40) at 58-59.

20  Upon arrival, Officer Reynolds spoke with Hodge, verified that Hodge had the
21  authority to make such an arrest, and examined the 5150 form that Hodge had filled out.
22  Keith Decl., Ex. B (Dkt. 39) at 28. The 5150 form stated:

> Client has been without psychotropic meds times one and a half
> years. Has been presenting with increased symptoms for
> several weeks. Client has not been seen by the house counselor
> times two weeks. Housemates reported that client has been
> coming and going at odd hours and reportedly said she had

---

[1] Hodge did not actually see Plaintiff with a knife.

[2] 5150 refers to California Welfare & Institutions Code section 5150, which sets forth the means of taking into custody "any person" when he or she, "as a result of a mental disorder, is a danger to others, or to himself or herself, or gravely disabled."

United States District Court
For the Northern District of California

> stopped eating. It was also reported that client has been wearing the same clothes for several days. Writer conducted outreach to client and she was not responsive. Made no sound behind her closed door. Writer and property management keyed in for wellness check.
>
> Client, upon opening the door, [...] was found lying in her bed with a book over her face, eyes open and was not responsive. Addressed client several times and she did not move or answer. Client then suddenly got up, threw the covers, and yelled at writer violently, "Get out of here! You don't have a warrant! I have a knife and I'll kill you if I have to!" Client then slammed her door and locked it behind her.

Loebs Decl., Ex. C at 21-22. Also on the form, Hodge checked the "gravely disabled" and "danger to herself or others" boxes to indicate the basis for the 5150 detention. Id. at 22. After speaking with Hodge and examining the 5150 form, Officer Reynolds decided to make contact with Plaintiff to verify that she met the criteria for detention under section 5150. Keith Decl., Ex. B at 29.

After giving Officer Reynolds a key to Plaintiff's room, Hodge led both officers to Plaintiff's apartment door, which was located at the end of a narrow "7" shaped hallway on the second floor. Id. at 30; see Loebs Decl., Ex. E-2 (photographs).[3] Once at the door, Officer Reynolds knocked and inserted the key into the door at the same time, told Plaintiff, "we are the police, we want to help," and then pushed open the door. Keith Decl., Ex. B at 30. When the door opened, Plaintiff jumped out of bed and screamed for the officers to leave her unit. Id. at 30-31. While moving toward the officers, Plaintiff picked up a large kitchen knife and threatened to kill the police officers. Id. at 31-33. The officers retreated backwards and Plaintiff closed the door. Id. at 31.

Thereafter, the officers called for backup, drew their department-issued weapons and instructed Plaintiff to drop the knife, explaining that they were there to help her. Keith Decl., Ex. C at 7. Initially, Officer Reynolds attempted to force open the door while Officer Holder kept her gun and pepper spray aimed at the door. Id.

---

[3] The Court has attached photographs of the scene. The photographs depict rather cramped quarters. The open door in the photographs leads to Plaintiff's room. A small alcove is located next to Plaintiff's door.

3

1 After watching Officer Reynolds struggle, Officer Holder asked that they switch
2 positions, handed Officer Reynolds her pepper spray and opened the door.[4] Id. at
3 10-11.

4 Plaintiff, standing about five to eight feet from the door, proceeded to move
5 toward the officers with the knife in her hand. Id. As she moved closer, Plaintiff
6 raised the knife and said that she was going to kill the officers. Id. Officer
7 Reynolds fired a stream of pepper spray into Plaintiff's eyes but it had "absolutely
8 no effect" on Plaintiff's forward movement. Id. at 11. According to Plaintiff, the
9 officers shot her with pepper spray while she still had the knife in a raised position,
10 as she made it to the door's threshold. Loebs Decl., Ex. G at 81. She asserts that the
11 pepper spray blinded her and caused her to move into the hallway. Id.[5] Plaintiff
12 turned towards Officer Holder, who had her back toward the short end of the
13 hallway, and continued to move toward Officer Holder with the knife raised in her
14 hand. Keith Decl., Ex. C at 11. Plaintiff was close enough to strike Officer Holder
15 with the knife. Id. at 16. Officer Holder testified that Plaintiff was so close to her
16 that if she had extended her arm to properly aim her firearm, she would have been
17 "well within" Plaintiff's striking distance. Id.

18 At this point, Officer Holder, with her back pressed against a wall, shot
19 Plaintiff two to three times in the center mass area with her firearm. Loebs Decl.,
20 Ex. B (dkt. 40) at 189-90. Plaintiff was about two to three feet from Officer Holder
21 after the last shot. Id. After being shot, Plaintiff turned towards Officer Reynolds

---

[4] It is unclear whether Officer Holder forced open the door or whether Plaintiff opened it herself. See Loebs Decl., Ex. G at 72. The Court finds that it is immaterial who opened the door.

[5] The Court accepts this version of events as true. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (when deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor). In both Plaintiff's account and the officers' accounts, Plaintiff was pepper-sprayed while advancing toward the officers with the knife, and continued to advance with the knife after she was pepper-sprayed.

4

and took a step toward her with the knife still in her hand.[6] Id. at 190. Officer Reynolds then rapidly shot Plaintiff two to three times, the last shot striking Plaintiff in the face.[7] Keith Decl., Ex. B at 37. Officer Holder testified that Plaintiff was on the ground when Officer Reynolds fired the last shot. Loebs Decl., Ex. B at 192.[8] Officer Reynolds shot Plaintiff from a distance of about two to four feet. Nisembaum Decl., Ex. C at 211.

While on the ground, Plaintiff did not release the knife but instead extended the knife away from her body. Loebs Decl., Ex. D at 214-220. Plaintiff testified that she had no intention of dropping the knife even after she was shot. Loebs Decl., Ex. G at 106. Plaintiff admitted that she did not drop the knife when she fell to the ground and that the officers could have perceived her as still presenting a threat. Id. at 105. Later, another officer, Officer Zachos, arrived at the scene, rushed towards the Plaintiff and kicked the knife out of her hands, marking the end of the confrontation. Keith Decl., Ex. B at 63-64. Officer Zachos testified that when he arrived, Plaintiff was still gripping the knife and moving it within striking distance of the officers.[9] Loebs Decl., Ex. E at 47-48. Plaintiff survived.

Subsequently, the San Francisco District Attorney prosecuted Plaintiff for assault with a deadly weapon, assault on a police officer with a deadly weapon and for making terrorist threats against Hodge. See Keith Decl., Ex. A. At trial, the jury

---

[6] Officer Reynolds testified that she was not sure if Plaintiff completely turned towards her when she fired her weapon. Loebs Decl., Ex. D at 208. However, Officer Reynolds testified that Plaintiff was yelling and attempting to assault her with the knife before she fired. Id.

[7] Officer Reynolds' first two shots struck Plaintiff in the center mass area. Keith Decl., Ex. B at 37.

[8] The Court notes that Officer Reynolds testified that Plaintiff was still standing when Officer Reynolds fired the last shot, Nisembaum Decl., Ex. C at 211, and that Plaintiff herself testified that she was "standing and then . . . fell against the wall" when the last shot was fired, Loebs Decl., Ex. G at 117, but will assume that Plaintiff was on the ground, as this is the version of the facts most favorable to Plaintiff.

[9] Officer Zachos marked a photograph to illustrate how close Officer Holder, Officer Reynolds and Plaintiff were when he arrived at the scene. Loebs Decl., Ex. E-2 (photograph Ex. 124).

5

1 acquitted Plaintiff of the terrorist threat charge but hung on the assault charges.  Id.
2 The District Attorney did not re-try the case.

3       On August 25, 2009, Plaintiff filed a complaint against Officer Reynolds,
4 Officer Holder, San Francisco Police Chief Heather Fong, and the City and County
5 of San Francisco, asserting causes of action under section 1983, the Americans with
6 Disabilities Act ("ADA"), and California state law.  See generally Compl.
7 Defendants have moved for summary judgment as to all claims.

## II.     LEGAL STANDARD

9       Summary judgment is appropriate where "the pleadings, depositions, answers
10 to interrogatories and admissions on file, together with the affidavits, if any, show
11 that there is no genuine issue of material fact and that the moving party is entitled to
12 judgment as a matter of law."  Fed. R. Civ. P. 56©.  A principal purpose of the
13 summary judgment procedure is to isolate and dispose of factually unsupported
14 claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden is on the
15 moving party to demonstrate that there is no genuine dispute with respect to any
16 material fact and that it is entitled to judgment as a matter of law.  Id. at 323.  A
17 genuine issue of fact is one that could reasonably be resolved in favor of the
18 nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
19 dispute is "material" only if it could affect the outcome of the suit under the
20 governing law.  Id. at 248-49.

21       If the moving party does not satisfy its initial burden, the nonmoving party
22 has no obligation to produce anything and summary judgment must be denied.
23 Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).
24 If, on the other hand, the moving party has satisfied its initial burden of production,
25 then the nonmoving party may not rest upon mere allegations or denials of the
26 adverse party's evidence, but instead must produce admissible evidence that shows
27 there is a genuine issue of material fact for trial.  Id. at 1103.  The nonmoving party
28 must "set out 'specific facts showing a genuine issue for trial.'"  Celotex, 477 U.S. at

324-25 (quoting Fed. R. Civ. P. 56©).  If the nonmoving party fails to make this showing, the moving party is entitled to judgment as a matter of law.  Id. at 323.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  Anderson, 477 U.S. at 255.  However, it is not a court's task "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).  Rather, a court is entitled to rely on the nonmoving party to identity with reasonable particularity the evidence that precludes summary judgment.  See id.

## III.   DISCUSSION

Defendants have moved for summary judgment as to all of Plaintiff's claims. Defendants' motion raises six issues: (1) whether collateral estoppel bars Plaintiff's arrest and malicious prosecution claims; (2) whether the officers' warrantless entry into Plaintiff's home falls within the Fourth Amendment's "emergency aid exception;" (3) whether the officers' use of deadly force against Plaintiff was lawful under the circumstances; (4) whether the officers' actions give rise to municipal liability; (5) whether the Defendants are liable under the ADA for arresting Plaintiff without first taking into account her mental disability; and (6) whether Plaintiff's state law claims are barred under a California immunity statute.

Defendants have also argued that qualified immunity applies to Plaintiff's section 1983 claims.  Mot. (dkt. 41) at 8.  In determining whether qualified immunity applies, courts ask (1) whether the officer's conduct violated a constitutional right and (2), "if a violation occurred, whether the right was "'clearly established in light of the specific context of the case.'"  See Bryan v. MacPherson, 630 F.3d 805 (9th Cir. 2010).  This Court will use as a threshold inquiry "whether the facts that . . . plaintiff has . . . shown . . . make out a violation of a constitutional

7

right." See Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 816 (2009).[10] Because Defendants' actions did not violate the Constitution, the Court need not reach the question of whether a reasonable officer could have believed her conduct was lawful under the clearly established governing law. See id. at 815.[11]

### A. Whether Collateral Estoppel Bars Plaintiff's Section 1983 False Arrest and Malicious Prosecution Claims

Plaintiff claims that Defendants falsely arrested and maliciously prosecuted her, thereby violating her constitutional rights under the Fourth Amendment. A finding of probable cause is a complete defense to false arrest and malicious prosecution claims. See Pierson v. Ray, 386 U.S. 547, 555 (1967); Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995). A federal court must give a state-court judgment the same preclusive effect as the state of rendition. 12 U.S.C. § 1738. A judgment from a state criminal proceeding may have preclusive effect in a subsequent section 1983 suit. See Allen v. McCurry, 449 U.S. 90, 103-104 (1980) ("There is . . . no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all."). If state courts would preclude a party from relitigating the issue of probable cause, then he or she is also precluded in federal court provided that she had a "full and fair opportunity to litigate the issue in the prior proceeding." See Haupt v. Dillard, 17 F.3d 285, 289 (9th Cir. 1994).

The Supreme Court of California requires that the following factors be met for collateral estoppel to apply:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, the issue

---

[10] The Court recognizes that under Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009), the rigid two-step procedure announced in Saucier v. Katz, 533 U.S. 194 (2001) is "no longer . . . mandatory," and the Court may use its discretion to decide which prong of qualified immunity analysis to address first.

[11] Of course, because the Court finds that no constitutional right was violated, the Court necessarily also finds that no clearly established right was violated.

8


> must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

Lucido v. Super. Ct., 51 Cal. 3d 335, 341 (1990). California criminal courts provide a full and fair opportunity to litigate the issue of probable cause at a preliminary hearing. See McCutchen v. City of Montclair, 73 Cal. App. 4th 1138, 1146-47 (1999) (noting that "a preliminary hearing is an adversary judicial proceeding, designed to litigate the issue of probable cause to try the accused on criminal charges" and concluding that "absent a showing that evidence not available to the arresting officer was presented at the preliminary hearing, a finding of sufficiency of the evidence to require the defendant to stand trial is a finding of probable cause to arrest the defendant").

     Here, the factors to apply collateral estoppel as to the probable cause issue have been satisfied. First, the probable cause inquiry Plaintiff asks this Court to make would be identical to that already made by the state trial court at Plaintiff's preliminary hearing. See McCutchen, 73 Cal. App. 4th at 1146. Second, Plaintiff does not dispute that probable cause was actually litigated and the trial record indicates that the magistrate judge made express probable cause findings. See Keith Decl., Ex. A. Third, probable cause was necessarily decided because, but for that determination, Plaintiff would not have stood trial. See Haupt, 17 F.3d at 289. Fourth, California courts, as a matter of California law, have ruled that "a finding of probable cause to hold [a] defendant over for trial is a final judgment on the merits for purposes of collateral estoppel." McCutchen, 73 Cal. App. 4th at 1146. Fifth, Plaintiff was a party to the previous proceeding as the accused. Lastly, California courts presume that a preliminary hearing provides a defendant with a full and fair opportunity to litigate probable cause, Id. at 1146-47, and Plaintiff has not challenged the fairness of her preliminary hearing in any respect.

9

The Court therefore finds that collateral estoppel prohibits Plaintiff from relitigating whether probable cause existed for her arrest and subsequent prosecution. As such, Plaintiff's false arrest and malicious prosecution claims fail as a matter of law, and Defendants' motion is granted as to those claims.[12]

### B. Whether Officers Reynolds and Holder Lawfully Entered Plaintiff's Home

Plaintiff claims that Defendants' warrantless entry into her home violated the Fourth Amendment. Compl. ¶¶ 37-54. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal citations and quotations omitted). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions." Id. (internal citations and quotations omitted). "[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Id. (internal citations and quotations omitted).

One exception to the Fourth Amendment's warrant requirement is the "emergency aid exception." Huff v. City of Burbank, 632 F.3d 539, 548 (9th Cir. 2011); Hopkins v. Bonvicino, 573 F.3d 752, 763 (9th Cir. 2009). Under this exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Michigan v. Fisher, --- U.S. ---, ----, 130 S. Ct. 546, 548 (2009). This exception "does not depend on the officers' subjective intent or seriousness of any crime they are investigating when the emergency arises." Id. "It requires only

---

[12] Defendants also argue that the undisputed facts demonstrate that there was probable cause to both arrest and prosecute Plaintiff. Plaintiff's threats toward Hodge and the officers plainly demonstrate that probable cause existed to both arrest and prosecute her.

1 an objectively reasonable basis for believing that a person within [the house] is in
2 need of immediate aid." Id. (internal citations and quotations omitted).

3 Here, Officers Reynolds and Holder had an objectively reasonable basis for
4 believing that Plaintiff needed immediate medical assistance. Hodge, a mental
5 health professional, requested police assistance to detain Plaintiff pursuant to
6 California law. Officer Reynolds spoke directly with Hodge about Plaintiff's
7 condition and examined the 5150 form that he prepared. The 5150 form stated that
8 Plaintiff: (1) stopped taking her psychotropic medication for over a year; (2)
9 manifested symptoms of mental illness for the last few weeks; (3) had not been seen
10 by her house counselor for the last two weeks; (4) told housemates that she no
11 longer needed to eat; (5) reportedly was wearing the same clothes for the last several
12 days; and (6) threatened to kill Hodge with a knife at the last wellness check. Hodge
13 also checked the "gravely disabled," and "danger to herself and others" boxes on
14 the 5150 form to indicate the basis for the detention. The officers entered Plaintiff's
15 home after gathering this information.

16 Because Hodge, a mental health professional, was a reliable source and the
17 facts articulated by him in the 5150 form strongly suggested that Plaintiff was
18 "gravely disabled," the officers had an objectively reasonable basis for believing that
19 Plaintiff was in need of immediate aid. See U.S. v. Black, 482 F.3d 1035, 1040 (9th
20 Cir. 2007) ("[e]rring on the side of caution is exactly what we expect of
21 conscientious police officers" during "a 'welfare search' where rescue is the
22 objective, rather than a search for crime" [and] "[courts] should not second-guess the
23 officers objectively reasonable decision in such a case"). As such, the officers'
24 warrantless entry into Plaintiff's home did not offend the Fourth Amendment. See
25 Duarte v. Begrin, 299 Fed. Appx. 711 (9th Cir. 2008) (officers' warrantless entry
26 into plaintiff's home pursuant to section 5150 fell within the Fourth Amendment's
27 exigent circumstances exception).
28

11

The Court notes that in her Opposition and at the motion hearing, Plaintiff's counsel appeared to argue that the it was the second entry into Plaintiff's room that violated the Fourth Amendment. See Opp'n at 17. Such a contention is without merit. Because the initial entry into the home was lawful, the second entry, on these facts, was also lawful. The emergency that justified the initial entry did not evaporate simply because the officers stepped out of the room. See, e.g., Michigan v. Tyler, 436 U.S. 499, 510-12 (1978); Fisher v. City of San Jose, 558 F.3d 1069, 1082 (9th Cir. 2009). Moreover, Plaintiff's threats against the officers and her advancing toward them with a raised knife gave rise to an additional basis for their entry. Re-entry after an officer's retreat to secure her own safety does not create a new constitutional violation. See People v. Hamilton, 105 Cal. App. 3d 113, 118 (1980). In addition, as in Black, 482 F.3d at 1040, "[t]his is a case where the police would be harshly criticized had they not investigated." When Plaintiff closed the door on the officers, they had no way of knowing whether she might escape through a back window or fire escape, whether she might hurt herself, or whether there was anyone else in her room whom she might hurt. Though, at the motion hearing, Plaintiff's counsel was dismissive of the notion that Plaintiff posed any danger once she was behind a closed door, Hodge had checked the "gravely disabled" and "danger to herself or others" boxes to indicate the basis for the 5150 detention. Loebs Decl., Ex. C at 22. It was objectively reasonable to believe that Plaintiff needed immediate medical assistance.

Accordingly, the Court grants summary judgment in favor of Defendants as to all of Plaintiff's unlawful entry claims.

**C.   Whether Officers Reynolds and Holder Used Excessive Force When They Shot Plaintiff**

Plaintiff claims that Officer Reynolds's and Officer Holder's use of force was excessive. It is axiomatic "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical [force]." Graham v. Connor, 490 U.S. 386, 396 (1989). "[A]ll claims that law enforcement officers

12

have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Id. (emphasis in original). Because the reasonableness inquiry "under the Fourth Amendment is not capable of precise definition or mechanical application," a court must pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting or attempting to evade arrest by flight." Id. at 396 (internal citations omitted).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." Id. (citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97 (citations omitted).

Here, the officers' use of force was objectively reasonable under the Fourth Amendment for two reasons.

First, it is undisputed that Plaintiff threatened to kill the officers with a knife. This threat gave the officers the right to arrest Plaintiff and to use some degree of force, even though she was mentally ill. See Gregory v. County of Maui, 523 F.3d 1103, 1106-07 (9th Cir. 2008) (use of force on man who "acted in a bizarre manner throughout the confrontation," armed only with a pen, was reasonable even though use of force resulted in death); Reynolds v. County of San Diego, 84 F.3d 1162, 1168 (9th Cir. 1996) (deadly force was reasonable where a suspect, who had been behaving erratically, swung knife at an officer), overruled on other grounds by Acri v. Varian Assoc., Inc., 114 F.3d 999, 1000 (9th Cir. 1997).

13

1    Second, the totality of circumstances demonstrate that it was reasonable for
2 the officers to shoot Plaintiff multiple times. Plaintiff threatened to kill the officers,
3 a severe crime. See Cal. P.C. § 245; Graham, 490 U.S. at 396. After threatening to
4 kill them, Plaintiff advanced toward the officers in a tight hallway with a large knife
5 raised. It is undisputed that Plaintiff was close enough to strike either officer with a
6 knife. In such circumstances, it was objectively reasonable for the officers to
7 believe that Plaintiff posed an immediate risk to their safety. See Graham, 490 U.S.
8 at 396; Smith v. City of Hemet, 394, F.3d 689, 702 (9th Cir. 2005) ("most important
9 single element" is "whether the suspect poses an immediate threat to the safety of
10 the officers or others"). It is also undisputed that Plaintiff actively resisted arrest.
11 See Graham, 490 U.S. at 396. Plaintiff testified that she had no intention of
12 dropping the knife even after she was shot. Loebs Decl., Ex. G at 106.

13    There are not "two [separate] tracks of excessive force analysis, one for the
14 mentally ill and one for serious criminals," see Bryan, 630 F.3d 829, but a court
15 must consider an individual's mental illness in determining the reasonableness of the
16 force employed, see Drummond v. City of Anaheim, 343 F.3d 1052, 1058 n.6 (9th.
17 Cir. 2003). Here, that Plaintiff was mentally ill, was acting irrationally (in
18 threatening to kill the officers and advancing toward them with a raised knife), and
19 was not subdued by the less forceful use of pepper spray, made the situation all the
20 more uncertain and dangerous to the officers. See Robbins v. City of Hanford, No.
21 CIV F 04-6672 AWI SMS, 2006 WL 1716220, at *15 (E.D. Cal. June 19, 2006)
22 (distinguishing cases involving use of force against mentally ill suspects who were
23 compliant or not threatening others).

24    The undisputed facts with respect to each shooting further reveal the
25 reasonableness of the officers' use of force. Officer Holder shot Plaintiff while she
26 had her back against a wall with Plaintiff closing in on her with a knife in hand.
27 Trapped and faced with an armed individual in close quarters, Officer Holder had no
28 choice but to shoot Plaintiff in order to protect herself. See Barber v. City of Santa

14

Rosa, No. C 08-5649 MMC, 2010 WL 5069868, at *5-6 (N.D. Cal. Dec. 7, 2010) (holding that shooting a mentally ill man armed with a knife who threatened to kill the officers was not unreasonable); Robbins, 2006 WL 1716220, at *15-16 (E.D. Cal. June 19, 2006) (officer shooting mentally ill person who cornered him in a room with a knife while trying to effectuate a 5150 detention was reasonable). That Officer Holder applied deadly force only after the use of pepper spray on Plaintiff was ineffective further demonstrates the reasonableness of her actions.

It also undisputed that Plaintiff did not fall to the ground after being shot by Officer Holder, but instead moved, with a knife still in her hand, toward Officer Reynolds. Officer Reynolds, perceiving Plaintiff as a threat to herself and Officer Holder, also shot Plaintiff two to three times. Assuming that Officer Reynolds fired her last shot at Plaintiff while she was on the ground, Officer Reynolds' actions were still objectively reasonable. Officer Reynolds fired at Plaintiff in rapid succession at close quarters in a tense, uncertain and rapidly evolving set of circumstances, making it difficult to discern when to stop shooting. In the context of an excessive force claim, the First Circuit stated:

> It may well be true that [the officer] continued to fire as [plaintiff] fell to or lay on the ground. But it is clear from the very brief time that elapsed that she made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation. [The officer's] action cannot be found unreasonable because she may have failed to perfectly calibrate the amount of force required to protect herself.

Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007). Plaintiff admits that she was still clutching the knife as she laid on the ground and that he had no intention of releasing it. While on the ground, Plaintiff continued to extend the knife away from her body and within striking distance of the officers.

Even in hindsight, no argument can be made that Officer Reynolds used excessive force by shooting Plaintiff after she had already been shot by Officer Holder. Officer Reynolds's actions were objectively reasonable given the situation she faced: a mentally ill person wielding a knife, threatening to kill her and her

15

partner, advancing on her in the confines of a small hallway to the point of being within striking distance. Officer Reynolds made a split-second judgment, the likes of which the Supreme Court has instructed lowers courts not to second-guess. See Graham, 490 U.S. at 397 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."). Officer Reynolds used deadly force only after she found that pepper spray was not enough force to contain the situation, and that there remained a continuing and credible threat to the officers' safety. That threat is not undermined by the use of hindsight. Indeed, the testimony of the officers and of Plaintiff, and the photographs attached hereto, confirm the officers' perception of a dire and escalating threat, and <u>no evidence</u> refutes the reasonableness of the officers' conduct.

      Accordingly, the Court finds that the officers' use of force was objectively reasonable under the circumstances. As such, Defendants' motion for summary judgment as to Plaintiff's excessive force claims is granted.

      **D.**    **Municipal Liability**

      Plaintiff asserts that the City of San Francisco and Police Chief Fong[13] violated her constitutional rights by failing to properly train the City's police officers. Though a municipality may face liability for failure to adequately train its officers under section 1983, that liability "is contingent on a violation of constitutional rights" by an individual officer. Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994). "If there was no constitutional violation of [the plaintiff's] rights, there is no basis for finding the officers inadequately trained." Long v. City and Cnty. of Honolulu, 511 F.3d 901, 907 (9th Cir. 2007) (internal citations and quotations omitted). Because, as

---

[13] There is no allegation that Fong participated personally in this incident.

discussed above, the officers' conduct did not offend the Constitution, Plaintiff's municipal liability claims necessarily fail.[14]

Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiff's municipal liability claims.

### E.   Americans with Disabilities Act Claim

Plaintiff alleges that Defendants discriminated against her, in violation of the ADA, by arresting her in a manner that did not take into account her mental disability. Compl. ¶¶ 55-59. Furthermore, Plaintiff alleges that Defendants' conduct excluded her from participating in City programs and denied her access to public benefits. Id. The ADA prohibits a public entity from discriminating against an individual on the basis of a qualified disability. See 42 U.S.C § 12132. The Ninth Circuit has ruled that section 12132 does not permit suits against private individuals. See Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002). Plaintiff cannot circumvent this restriction by bringing her claims under section 1983. Id.

Under the ADA, a disabled plaintiff can state a claim if he can show that, because of his disability, he was either "excluded from participation in or denied benefits of the services, programs, or activities of a public entity," or "was otherwise subjected to discrimination by any such entity." Hainze v. Richards, 207 F.3d 795, 799 (5th Cir. 2000) (internal quotations omitted). In Hainze, the court held that section 12132 does not permit a cause of action based on an "officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." Id. at 801. The court went on to note:

> To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled

---

[14] Nor has Plaintiff pointed to evidence of a policy of deliberate indifference.

17

> individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the general public.

Id.

The Firth Circuit's reasoning is persuasive.[15]  Here, the officers attempted to detain a violent, mentally disabled individual under exigent circumstances.  It would be unreasonable to ask officers, in such a situation, to first determine whether their actions would comply with the ADA before protecting themselves and others.

Plaintiff has asserted claims against all Defendants under the ADA.  Because section 12132 does not permit claims against individuals, the claims against the officers fail as a matter of law.  Furthermore, because Plaintiff cannot state a claim against the City for actions taken by the officers prior to her arrest, the claim against the City also fails.

Accordingly, the Court grants summary judgment in favor of the Defendants as to Plaintiff's ADA claims.

**F.    State Law Claims**

Plaintiff has also asserted various state law claims based on the same facts that make up her federal claims.  Compl. ¶¶ 60-74.  Under California law, an individual authorized to detain a person under section 5150 shall not be held criminally or civilly liable for exercising this authority in accordance with the law.  Cal. Welf. & Inst. Code § 5278.  Because, as discussed above, the officers – individuals authorized to detain a person under section 5150 – lawfully arrested, searched and used reasonable force under the circumstances, section 5278 bars all of Plaintiff's state law claims.  See Bias v. Moynihan, 508 F.3d 1212, 1221 (9th Cir. 2007).

Accordingly, the Court grants summary judgment in favor of Defendants as to all of Plaintiff's state law claims.

---

[15] The parties do not cite to any Ninth Circuit authority on this issue, and the Court has found none.  But see Schreiner v. City of Gresham, 681 F. Supp. 2d 1270, 1279 (D. Or. 2010) (allowing ADA claim to go forward where "the situation was under control and rather than inflicting pain upon her, [the officer] should have consulted with paramedics and administered medical treatment").  The Court finds that unlike in Schreiner, the situation here was not "under control" when the shots were fired.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment in favor of Defendants as to all of Plaintiff's claims. As a matter of law, Plaintiff's false arrest and malicious prosecution claims fail under principles of collateral estoppel. The officers' warrantless entry into Plaintiff's home falls within the emergency aid exception to the Fourth Amendment's warrant requirement. Plaintiff threatened to kill the officers, while advancing on them, with a knife in her hand; the officers' use of force was reasonable under the circumstances. Plaintiff's municipal liability claims fail because the officers did not violate any of her constitutional rights. Plaintiff's ADA claim fails, as a matter of law, because section 12132 does not expose police officers to liability under the ADA in these circumstances. Lastly, Plaintiff's state law claims fail because California law immunizes individuals from all claims arising out of the lawful detention of a person under section 5150.

**IT IS SO ORDERED.**

Dated: May 6, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE